STATE of Missouri, Respondent,

v.

**Pharis Lynn WATT, Appellant.**

**WD 79585**

Missouri Court of Appeals, Western District.

OPINION FILED: July 18, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied September 5, 2017

Application for Transfer Denied November 21, 2017

Joshua D. Hawley, Attorney General, and Daniel N. McPherson, Assistant Attorney General, Jefferson City, MO, Attorneys for Respondent.

Jedd C. Schneider, Assistant Public Defender, Columbia, MO, Attorney for Appellant.

Before Division Two: Thomas H. Newton, Presiding Judge, and James Edward Welsh and Karen King Mitchell, Judges

Karen King Mitchell, Judge

Pharis Watt appeals, following a jury trial, his conviction for driving while intoxicated in violation of § 577.010,[1] for which he was sentenced as a persistent offender under § 577.023 to a term of four years' imprisonment, with a recommendation for institutional treatment under § 559.115. Watt argues that the trial court erroneously excluded demonstrative evidence he proffered in the form of a voice exemplar

---

1. All statutory citations are to the Revised Statutes of Missouri, 2000, as updated through the 2016 Cumulative Supplement, unless otherwise noted.

in violation of his right to due process. Finding no error, we affirm.

## Background

On July 27, 2014, around 1:00 a.m., Lori Mitchell was driving on Scott Boulevard in Columbia, Missouri, when she encountered a vehicle swerving on the roadway and driving in the wrong direction. Mitchell called 911 to report the erratic driving. At 1:23 a.m., Columbia Police Officers Regan Gustafson and Ryan Holtz responded to the call.

Officers Gustafson and Holtz came upon a vehicle matching the description provided by Mitchell (a white sedan missing its rear bumper) stopped, but with the engine still running, partially on the shoulder and partially in the roadway a short distance from where Mitchell first reported seeing the car. The front passenger tire was directly against the curb and appeared damaged. The officers approached Watt, who was seated in the driver's seat of the vehicle, and asked him to turn the engine off.

Upon approaching the vehicle, Officer Gustafson immediately smelled a very strong odor of intoxicants coming from the interior of the vehicle and noticed that Watt's eyes were bloodshot and watery. Before Officer Gustafson could say anything to Watt, he "handed [her] his Triple A card and ... ask[ed her] to call Triple A for him," an action he repeated "a couple of times." When Officer Gustafson asked Watt for his identification and insurance card, he continued trying to hand her his Triple A card. Officer Gustafson asked Watt where he was coming from, and he indicated "a friend's house," but, when asked to clarify where that friend's house was located, Watt provided "a series of numbers that changed a couple of different times, [and] was not able to give ... a street [name] at that point." When asked where he was going, Watt indicated that he was headed to a convenience store for cigarettes.

Officer Gustafson asked Watt if he had been drinking that evening. He initially indicated that he had not. Officer Gustafson noticed that Watt's speech was slurred and "a little bit halting." She then asked Watt to exit the vehicle, and, when he did, "he was unsteady on his feet and swaying." Upon being asked to perform field sobriety tests, Watt immediately responded by stating that he had injuries to his back, shoulder, hip, and knees. The officers moved Watt across the street to a vacant parking lot for safety reasons; as he walked across the street, he appeared unsteady on his feet, swaying side to side and staggering slightly. Officer Gustafson again asked Watt if he'd had anything to drink, and, at that time, he said he had consumed one beer approximately three hours earlier.

Once they reached the parking lot, Officer Gustafson had Watt perform two field sobriety tests: the Horizontal Gaze Nystagmus (HGN) test and the one-leg stand test. Watt scored four out of a possible six clues of intoxication on the HGN test and three out of a possible four clues of intoxication on the one-leg stand test. In Officer Gustafson's experience, a strong odor of intoxicants and bloodshot, watery eyes were also indicators of intoxication and ones that would not result from consumption of a single beer. Based upon all of her observations of Watt, Officer Gustafson determined that he was too impaired to safely operate a motor vehicle, so she placed him under arrest.

Watt suggested to Officer Gustafson that he might be having trouble with his blood sugar, despite statements that he had taken all of his medication appropriately earlier that day. Consequently, Officer Gustafson called for medics. While awaiting the arrival of the medics, Officer Gustafson observed Watt to be unsteady

on his feet and swaying slightly. Watt asked if he could sit down, and Officer Gustafson helped him do so. Despite suggestions to the contrary, Watt tried to lie down on his back, but complained of pain from his arms being handcuffed behind him, so Officer Gustafson attempted to help him roll onto his side, but he rolled himself face-first into the grass, causing Officer Gustafson to again assist him in rolling into a comfortable position, where he remained until the medics arrived. When the medics arrived, they tested Watt's blood sugar level and determined it to be within the normal range.

After being medically cleared to be taken into custody, Watt was transported to the Columbia Police Department for booking. During the drive, Watt repeatedly asked the officers why they believed he was driving while intoxicated, which had been discussed with him both at the scene and multiple times in the car. Watt reiterated that he had consumed only one beer, but he kept changing the time at which he supposedly had it from three hours prior to his arrest all the way up to the morning before his arrest. Throughout the drive, Watt's speech was slurred and halting; Officer Gustafson indicated that it "took him a little while to get certain sentences out."

When they arrived at the station, Officer Gustafson opened the car door and asked Watt to step out, but he advised her that he could not do so on his own. Officer Gustafson attempted to assist Watt by first moving his feet outside the car and then eventually lifting up on his arms. But Watt kept lifting his feet in the air, making it difficult to lift him from the car; he had to be asked to put his feet down to bear his own weight. Once inside the station, Watt again asked why the officers believed he was intoxicated. When asked to remove his belt, Watt declared that he was "incog-

nito," which he explained meant he was not wearing any underwear.

Watt was charged, as a persistent offender, with the class D felony of driving while intoxicated in violation of § 577.010. At trial, during the cross-examination of Officer Gustafson, Watt's counsel questioned whether Officer Gustafson had ever heard Watt speak outside of their contact the night of his arrest. When Officer Gustafson indicated that she had not, Watt's counsel suggested that Officer Gustafson could not "know how [Watt's speech] that night compares to [Watt's] normal inflection." Officer Gustafson agreed. Then, after the close of the State's evidence but outside the presence of the jury, Watt's counsel sought to present demonstrative evidence in the form of a voice exemplar by having Watt read aloud to the jury one of his own statements from the videotape evidence, introduced during the State's case-in-chief, for the purpose of allowing the jury to assess whether Watt's speech pattern presented on the videotape should be considered as evidence of intoxication as opposed to simply his normal speaking style. Watt specifically sought a ruling that he be allowed to do so without cross-examination, claiming that the evidence would be demonstrative, rather than testimonial. The State objected, arguing that, if Watt were permitted to provide the evidence, he would be waiving his right to be free from self-incrimination and open himself up to cross-examination. The trial court sustained the objection, noting that

> demonstrative evidence, normally, you know, it's here, you review it, you understand and agree to the accuracy. And this, I mean, how do we know he's going to read it in his true voice? I mean, he could make up any voice. He could do it in a Donald Duck voice, and we'd have no way of knowing whether—he hasn't said anything here today. He's chosen not to testify. We don't know what he

talks like. And the purpose of it would be to impeach, I assume, the officer's earlier statements as to the speech slurred and how that influenced [her] opinion as to the intoxication and impairment. And so I think there's all kinds of issues with it.

If it had been done ahead of time and everybody agreed, you know, that this was a true sample of his true voice, then that's one thing. But to say, Here, read this—I mean, you have no idea what kind of voice he's going to use.

After the jury was called back in, Watt's counsel requested a sidebar at which he stated:

Your Honor, at this time we're going to ask that the Court allow—we're going to ask the Court to allow Mr. Watt to make a statement for demonstrative evidence purposes only and have him read a sentence that was taken directly from the tape that the jury watched previously. And I think the State is going to have an objection to that.

Watt's counsel made no further effort to present the court with the proposed voice exemplar. The State reiterated its prior objection, and the trial court again sustained it. Watt presented no evidence, and following deliberation, the jury found him guilty of driving while intoxicated. The trial court later sentenced Watt, as a persistent offender, to a term of four years with a recommendation for institutional treatment under § 559.115. Watt appeals.

## Standard of Review

■ "Trial courts retain broad discretion over issues of relevancy and admissibility of evidence, and we will not interfere with those decisions unless there is a clear showing of abuse of discretion." *State v. Gorman*, 468 S.W.3d 428, 431 (Mo. App. W.D. 2015) (quoting *State v. Smith*, 314 S.W.3d 802, 807 (Mo. App. E.D. 2010)). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* (quoting *Smith*, 314 S.W.3d at 807).[2]

## Analysis

Watt raises a single point on appeal. He argues that the trial court erred in excluding his proposed voice exemplar from evidence, claiming that the exclusion constituted a violation of his right to due process. We disagree.

**A. The admissibility of a voice exemplar as demonstrative evidence offered by a defendant is an issue of first impression in Missouri.**

**2.** The State argues that Watt failed to preserve his claim for review insofar as he failed to make a sufficient offer of proof at trial when seeking to admit the voice exemplar. Though the State is correct that, "[w]here proffered evidence is excluded, relevancy and materiality must be shown by specific facts sufficient to establish admissibility so as to preserve the matter for review," *State v. Tisius*, 92 S.W.3d 751, 767 (Mo. banc 2002), the issue here is not the sufficiency of Watt's offer of proof. To be sufficient, "[a]n offer of proof must show three things: 1) what the evidence will be; 2) the purpose and object of the evidence; and 3) each fact essential to establishing the admissibility of the evidence." *Id.*

Here, in the offer of proof, Watt's counsel indicated what the evidence would be (a voice exemplar made by way of Watt reading a single sentence from the previously admitted videotaped evidence), the purpose and object of the evidence (to impeach the officers' testimony that Watt's slurred speech suggested impairment), and he argued the facts essential to establish its admissibility (by claiming it would be an authentic and unrehearsed example of Watt's actual speech patterns). The problem was not with the offer of proof, but, as will be discussed further, the problem is that Watt failed to meet his burden of demonstrating the necessary prerequisite of authenticity.

Though Missouri courts have repeatedly addressed the admissibility of demonstrative evidence, the question of admissibility of a voice exemplar offered by a defendant as demonstrative evidence has not yet been addressed. We begin with the admissibility of demonstrative evidence, generally.

The Missouri Supreme Court has held that "[d]emonstrative evidence may be admissible as long as it is both logically and legally relevant." *Johnson v. State*, 406 S.W.3d 892, 902 (Mo. banc 2013). "Logical relevance refers to the tendency to make the existence of a material fact more or less probable." *Id.* (quoting *State v. Brown*, 337 S.W.3d 12, 15 (Mo. banc 2011)) (internal quotations omitted). "Legal relevance weighs the evidence's probative value against 'unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness.'" *Id.* (quoting *State v. Freeman*, 269 S.W.3d 422, 427 (Mo. banc 2008)). "Therefore, when assessing the relevance of demonstrative evidence, a court must ensure that the evidence is a fair representation of what is being demonstrated and that it is not inflammatory, deceptive or misleading." *Id.* (quoting *Brown*, 337 S.W.3d at 15).

Regarding the admissibility of voice exemplars, the United States Supreme Court has repeatedly upheld the use of voice exemplars as demonstrative evidence when offered by the government against a criminal defendant, rejecting the notion that such evidence violates a defendant's right to be free from self-incrimination. *See U.S. v. Dionisio*, 410 U.S. 1, 5-6, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *U.S. v. Wade*, 388 U.S. 218, 222-23, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California*, 388 U.S. 263, 266-67, 87 S.Ct. 1951, 18 L.Ed.2d 1178

(1967); *Schmerber v. California*, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that the privilege against self-incrimination "offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture").

Watt argues that the due process principle of reciprocity[3] requires that criminal defendants likewise be granted the right to seek admission of voice exemplars without being deemed to have waived their right to be free from self-incrimination. Though Missouri has yet to address this issue, it appears—and the State concedes—that other state and federal courts agree with Watt's argument. *See, e.g., Taylor v. U.S.*, 601 A.2d 1060, 1065-67 (D.C. App. 1991) (holding that "the judge could not properly exclude the voice exemplar on the ground that [the defendant] refused to take the witness stand and submit to cross-examination about his involvement in the crime"); *State v. Valentine*, 630 N.W.2d 429, 435 (Minn. App. 2001) (holding "that if the prosecution can compel a defendant to produce a voice exemplar without infringing on his privilege against self-incrimination, then the due process principle of reciprocity demands that a defendant should be allowed the same opportunity without waiving his Fifth-Amendment privilege"); *Marsh v. Commonwealth*, 32 Va.App. 669, 680-81, 530 S.E.2d 425 (Va. App. 2000) (holding that "the trial court erred in finding that the voice exemplar was testimonial in nature requiring [the defendant] to be subjected to cross-examination under oath"); *People v. Scarola*, 71 N.Y.2d 769, 777-78, 530 N.Y.S.2d 83, 525 N.E.2d 728 (1988) (holding that "voice exemplar evi-

**3.** *See Wardius v. Oregon*, 412 U.S. 470, 472, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) (holding "that the Due Process Clause of the Four-teenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants").

dence offered by ... defendants was broadly relevant, and the trial courts could have exercised their discretion to admit it without permitting substantive cross-examination"); *State v. Tillett*, 351 So.2d 1153, 1157 (La. 1977) (holding "that if the state can compel a criminal defendant to demonstrate his physical characteristics before the jury without infringing on his fifth amendment rights, a defendant's offer of such a demonstration does not constitute a waiver of that same right"). Thus, we agree with Watt that the trial court lacked the authority to exclude his proffered voice exemplar, offered as demonstrative evidence, solely on the ground that Watt refused to submit to cross-examination.

But this was *not* the trial court's basis for exclusion. The trial court excluded Watt's proffered voice exemplar because Watt failed to establish that his proffered voice exemplar would represent a "true sample of his true voice." And though Missouri courts have not addressed this aspect of admissibility of demonstrative evidence as it pertains to voice exemplars, there is abundant authority regarding the admission of handwriting exemplars.

■ Section 490.640 addresses the admissibility of handwriting exemplars as demonstrative evidence. It provides:

Comparison of a disputed writing with any writing *proved to the satisfaction of the judge to be genuine* shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute.

§ 490.640 (emphasis added). Thus, the sole prerequisite for admission of a handwriting exemplar is that it must be "proved to the satisfaction of the judge to be genuine." *See In re Marriage of Schulz*, 583 S.W.2d 735, 745 (Mo. App. E.D. 1979)

("The authenticity of the signature to be employed as an exemplar for comparison with the disputed signature must be established to the satisfaction of the trial judge."). And this requirement follows the general requirement for admissibility of demonstrative evidence—"that the evidence is a fair representation of what is being demonstrated and that it is not inflammatory, deceptive or misleading." *Johnson*, 406 S.W.3d at 902.

■ Several cases from other state and federal courts, including many of those cited above, also follow this principle. *See Newman v. Hopkins*, 247 F.3d 848, 853 (8th Cir. 2001) (holding "that the state of Nebraska has a legitimate interest in the reliability of evidence, and if the facts and circumstances surrounding a particular voice exemplar make it so unreliable as to render it inadmissible under Nebraska's evidentiary rules, a defendant would have no absolute right to introduce it"); *Taylor*, 601 A.2d at 1066-67 (holding that "[d]ecisions regarding the admission of demonstrative evidence rest within the broad discretion of the trial court and may entail foundational inquiry into the trustworthiness of the proffered evidence" (internal citation omitted)); *U.S. v. Esdaille*, 769 F.2d 104, 107-08 (2d Cir. 1985) (holding that the trial court did not err in excluding a proffered voice exemplar where there was a dispute as to its trustworthiness and authenticity); *Marsh*, 32 Va. App. at 683-84, 530 S.E.2d 425 (holding that, although a voice exemplar could not be excluded solely because of a defendant's refusal to be subjected to cross-examination, it could be excluded for a lack of reliability); *Scarola*, 71 N.Y.2d at 776-77, 530 N.Y.S.2d 83, 525 N.E.2d 728 (holding that "the fact that an exhibition of a physical characteristic is not testimonial in nature does not necessarily require its reception as evidence at trial[;] [t]he test of whether voice exemplar evidence should

be admitted as real or demonstrative evidence is not whether the proposed exemplar would be communicative, but whether it is relevant and reliable"). Thus, we hold that, before a proffered voice exemplar offered by a defendant may be deemed admissible as a demonstrative exhibit, the defendant must prove to the satisfaction of the trial judge that the proffered exemplar is a genuine and authentic sample of his or her true speaking voice.[4]

■ In the context of handwriting exemplars, "Missouri courts have noted that 'there is no precise method by which a specimen must be proved to be genuine and the proof may be either direct or circumstantial.'" *Boyd v. Civil Serv. Comm'n of City of St. Louis*, 657 S.W.2d 83, 86 (Mo. App. E.D. 1983) (quoting *State v. Clark*, 552 S.W.2d 256, 264 (Mo. App. 1977)). "The courts have not restricted the manner in which specimens may be proved genuine and each case must be viewed on its own facts."[5] *Id.* (quoting *Clark*, 552 S.W.2d at 264). "The action of the court in

admitting or rejecting a specimen as a standard, is a matter of discretion[, and i]ts action is final and conclusive unless based on an error of law, or on evidence which is, as a matter of law, insufficient to justify its finding." *Id.* (quoting *Clark*, 552 S.W.2d at 264).

■ Based upon the foregoing, we hold that voice exemplars, when offered by criminal defendants solely as demonstrative—and not testimonial—evidence, may not be excluded on the basis that the defendant wishes to offer them without submitting to cross-examination. But, before such voice exemplars are admissible, a defendant must prove to the satisfaction of the trial judge that the proffered sample is a genuine and authentic sample of his or her true speaking voice. If the defendant offers satisfactory proof of genuineness and authenticity, it is then within the trial court's discretion whether to admit the evidence after evaluating its logical and legal relevance. So long as the evidence would not be "inflammatory, deceptive or

4. Many of the other state and federal cases discuss proposed exemplars in terms of "reliability," often relying on the perceived ease with which a given speech characteristic is feigned; if the characteristic at issue is deemed easily feigned (such as an accent), the courts treat the exemplar as unreliable and find that it, therefore, lacks legal relevance due to its tendency to mislead. In Missouri, when evaluating the admissibility of demonstrative evidence, the proponent must demonstrate the following: (1) the evidence is logically relevant; (2) the proposed exemplar is an authentic or genuine representation of the thing it purports to represent; and (3) the proposed exemplar is legally relevant insofar as it is not inflammatory, deceptive, or misleading. While there is potential overlap between (2) and (3), they are still separate inquiries that must be demonstrated to the trial court's satisfaction by the proponent of the evidence.

Because authenticity is a separate inquiry from legal relevance, the court's focus must be on the particular exemplar offered in the

case, regardless of which speech characteristic a defendant is seeking to demonstrate and whether that characteristic is easy to feign. In other words, the simple fact that an accent might be easy to feign is an insufficient reason, alone, to exclude a defendant's proposed exemplar offered to demonstrate a speech characteristic. Instead the court must individually evaluate the exemplar proposed by the defendant and decide if that particular exemplar is authentic and genuine. Though the court may consider whether the characteristic at issue lends itself to easy feigning when deciding admissibility, the court must still evaluate the specific evidence presented, allowing for the possibility that even easy-to-feign characteristics could be authentically and genuinely presented by the individual defendant's proposed exemplar.

5. The State, of course, has the option to stipulate to genuineness and authenticity, thereby negating the need for any proof by the defendant. The State did not do so here, however, so Watt bore the burden of proving genuineness and authenticity of the voice sample.

misleading," a trial court acts wholly within its discretion in admitting it.

## B. Watt failed to establish the admissibility of his proposed voice exemplar.

■ Turning now to the facts before us, the question is whether Watt satisfied his burden of proving to the trial court that his proffered voice exemplar, offered solely for demonstrative purposes, was a genuine and authentic sample of his true speaking voice. For two reasons, we hold that he did not.

First, as the trial court noted, Watt chose not to testify; thus, the trial court had no experience with Watt's normal speaking voice so as to judge whether a proffered voice exemplar made at trial would constitute a genuine and authentic sample of Watt's true speaking voice.[6] This is not to say that Watt needed to testify to meet his burden; rather, we mention this merely to point out one way in which Watt could have proven genuineness and authenticity. Furthermore, though we understand Watt's counsel's rationale,[7] by not having Watt actually read or provide a sample for the court outside of the jury's presence, the trial court was simply left with no basis upon which to determine genuineness or authenticity of the proposed exemplar.

Second, the circumstances surrounding the proposed voice exemplar appropriately caused the trial court to question whether it would be either deceptive or misleading and, thus, preclude its admissibility. In *Johnson v. Crown Finance Corp.*, 222 S.W.2d 525 (Mo. App. 1949), the appellants claimed error in the exclusion of their proffered handwriting exemplars made in court for the express purpose of serving as evidence. The appellate court rejected the appellants' claimed error, holding:

It is the general rule that *where the genuineness of a person's handwriting is in dispute, he cannot offer in his own behalf other specimens of his handwriting made after the controversy arose for the very purpose of being used as standards with which to compare the disputed handwriting.* The obvious reason is that the temptation would be too great that he change or disguise his handwriting intentionally; and generally speaking, unless the specimen was written in the ordinary course of business, he is to be confined for his standard of comparison to handwriting antedating the inception of the controversy so as to negative any idea that he had manufactured evidence for himself. *It is of course all the more imperative that he not be permitted to write something during the trial itself as a part of his own case and submit such a specimen as a standard for comparison.*

*Id.* at 530 (emphasis added) (internal citations omitted). The court held that the appellants' proffered handwriting exemplar, written in court for the express purpose of being used as evidence in the dispute over genuineness, "was plainly self-serving and inadmissible." *Id.* The court noted that, because the issue was whether the signatures appearing on a note—purporting to be those of the appel-

---

6. At oral argument, Watt's appellate counsel argued that the trial court had the opportunity to hear Watt speak during the *Frye* hearing and a waiver colloquy. A review of the record demonstrates that although the trial judge may have heard Watt's voice, there were insufficient examples to conclude that Watt met his burden of proving to the trial judge the genuineness and authenticity of the proposed voice exemplar.

7. Watt's counsel indicated that he did not want Watt to know the statement he was to read beforehand so as to avoid any appearance that the statement was rehearsed.

lants—were genuine signatures of the appellants, "any of their own handwriting, *if not made for the express purpose of being used as evidence,* would have been admissible as a standard for comparison." *Id.* (emphasis added).

Here, the circumstances surrounding Watt's proffered voice exemplar are indistinguishable from the proffered handwriting exemplar offered by the appellants in *Johnson.* As *Johnson* demonstrates, Watt could have satisfied the court that the voice exemplar was a genuine and authentic sample of his voice by offering a different sample of his speaking voice made outside the context of his criminal trial, such as a voicemail or other audio recording predating his arrest.[8] But because the proffered voice exemplar was to be created during trial, *in front of the jury,* for the express purpose of serving as evidence to counter the State's case, Watt did not provide the trial court with an appropriate sample upon which it could evaluate genuineness and authenticity in order to determine admissibility.

**C. Watt suffered no prejudice from the exclusion of his voice exemplar.**

▮▮▮▮ Although we hold that the trial court committed no error in excluding Watt's proffered voice exemplar, it is also worth noting that the exclusion resulted in no prejudice to Watt. He sought to admit the voice exemplar to counter the inference raised by the State's evidence that Watt's slurred and halting manner of speech during his arrest evidenced intoxication. But Watt's slurred and halting speech was not the sole basis supporting an inference of intoxication; thus, any evidence suggesting that his speech on the night of his arrest was normal for Watt would not have altered the jury's determination of guilt. Accordingly, even if the

exclusion were erroneous, such error would have been harmless.

▮▮▮▮ Though "the erroneous exclusion of evidence in a criminal case creates a ... presumption of prejudice," that presumption is rebuttable. *State v. Ellis,* 512 S.W.3d 816, 825 (Mo. App. W.D. 2016) (quoting *State v. Miller,* 372 S.W.3d 455, 472 (Mo. banc 2012)). "The state may rebut this presumption [of prejudice] by proving that the error was harmless beyond a reasonable doubt." *Id.* (quoting *Miller,* 372 S.W.3d at 472). "In assessing whether the exclusion of evidence was harmless beyond a reasonable doubt, the facts and circumstances of the particular case must be examined, including the nature of the charge, the evidence presented, and the role the excluded evidence would have played in the defense's theory." *Id.* (quoting *State v. Sanders,* 126 S.W.3d 5, 23 (Mo. App. W.D. 2003)). In addition to the slurred and halting speech exhibited by Watt, Officer Gustafson testified that she also smelled a strong odor of intoxicants upon approaching Watt's vehicle, she noticed his eyes to appear bloodshot and watery, she observed him to be unsteady on his feet, and he exhibited four out of six possible clues of intoxication on the HGN test and three out of four possible clues of intoxication on the one-leg stand test. Furthermore, Watt's vehicle had been observed swerving and driving in the wrong direction before it was found on the side of the road with damage suggesting it had been driven into the curb. Additionally, Watt was unable to give an accurate or consistent description of where he had come from and how recently he had consumed alcohol. And he repeatedly asked the officers to explain to him the basis for their belief that he was intoxicated, despite

---

8. This is not to suggest that any *voice* exemplar created post-arrest would be *per se* inadmissible. But, as *Johnson* indicates, the timing of an exemplar's creation may certainly be considered by the trial court in assessing reliability of the proffered evidence.

the fact that they had explained it to him on numerous occasions.

Beyond this abundant evidence of intoxication, Watt's counsel was still able to argue to the jury—even without the voice exemplar—that Officer Gustafson erroneously relied on Watt's speech pattern as evidence of intoxication. During cross-examination, Watt's counsel elicited a concession from Officer Gustafson that she was unfamiliar with Watt's normal speaking voice and, thus, had no way of knowing if his speech on the night of his arrest was distinct from his normal speaking patterns. For all of these reasons, Watt simply cannot demonstrate any prejudice from the exclusion of his proffered voice exemplar; thus, any error in its exclusion would have been harmless beyond a reasonable doubt.

Point denied.

## Conclusion

Voice exemplars, when offered solely as demonstrative evidence by criminal defendants, cannot be excluded on the ground that the defendant chooses not to take the stand and submit to cross-examination. But, to be admissible, they must be proven by the defendant to the satisfaction of the trial court to be genuine and authentic samples of the defendant's true voice and speech patterns. Here, Watt failed to meet his burden of proving genuineness and authenticity; thus, the trial court committed no error in excluding the proffered voice exemplar. Furthermore, Watt has not demonstrated any prejudice from exclusion of the evidence. The trial court's judgment is affirmed.

Thomas H. Newton, Presiding Judge, and James Edward Welsh, Judge, concur.